## Louisville & Nashville Railroad Company v. Stayton's Administrator.

(Decided March 26, 1915.)

### Appeal from Marion Circuit Court.

1. Master and Servant—Appliances—Damages.—In an action for damages because of the failure to furnish a workman a safe appliance with which to do the work required of him, it is not sufficient to authorize a recovery to show only that the appliance was not safe, but it must also be shown that the unsafe appliance was the proximate cause of the injury.

2. Master and Servant—Personal Injuries.—Courts and juries are not authorized to speculate or theorize, without substantial evidence, as to how accidents are brought about; there must be either direct evidence, or such circumstances shown as will enable one to determine with some degree of accuracy the cause or causes.

3. Master and Servant—Personal Injuries.—When there is given to the evidence its fullest effect, and considering every fair inference that may be deduced from it, the injury may as reasonably be attributed to a cause for which the defendant was not liable, as to a cause for which it was liable, there can be no recovery.

W. C. McCHORD, P. K. McELROY and C. H. MOORMAN for appellant.

C. C. BOLDRICK, W. H. SPRAGENS, ROBT. HARDING and JOHN W. RAWLINGS for appellee.

OPINION OF THE COURT BY JUDGE TURNER—Reversing.

Richard Stayton was, in November, 1912, employed by appellant as a member of a bridge painting crew, and on the 22nd of November, 1912, that crew was paint-

ing an iron overhead bridge on appellant's line in Nelson County.

The crew consisted of the foreman, Clapham and Stayton, Basham, Unseld, and Troutman. The workmen under the superivsion of Clapham were painting the outside of this iron bridge, Stayton and Basham being on the staging or scaffold on one side of the bridge, and Unseld and Troutman on a similar structure on the other side, and the four men were, therefore, facing each other, distant from each other the width of the bridge, which was about 18 feet.

The scaffolding was constructed in this way: Two large iron hooks were fastened over the top beam of the bridge and by means of a small hook were attached to a block containing a double pulley; down near the scaffolding where the workmen were operating there was another block with only a single pulley; a rope was first attached to a link or hook in the top of the lower block, then run through one of the pulleys of the upper block, thence through the single pulley of the lower block, thence on back through the other pulley of the upper block, and after going through this last pulley it was dropped down to the scaffolding below, and was known as the "fall line," by means of which, working through these two blocks, the staging or scaffolding was raised or lowered as the work might require. On the bottom of the lower block was fastened an iron hook which hooked under an iron stirrup; through these iron stirrups at each end of the scaffolding, was run a ladder upon which was placed a plank, and this made a sort of platform upon which the painters stood or sat in the carrying on of their work.

The "fall line," being the line which last came through the upper block, was brought in under the upper part of the iron of the stirrup and tied with a loop or half-knot around the point of the hook which held the stirrup. The hook which held the iron stirrup on the side of the scaffolding where Stayton was at work became disengaged therefrom, which caused that end of the ladder and plank to swing down, thereby throwing Stayton to the river bed below, about 75 feet, which caused his death.

This action was instituted by his administrator, claiming damages for his death, and the chief negligence relied on is the failure of appellant to furnish to dece-

dent a reasonably safe appliance with which to do the work required of him, and the evidence is wholly directed at showing that the iron stirrup, so furnished to Stayton, by reason of its formation and dimensions, was an unsafe and unsuitable instrument or tool, and not constructed so as to securely hold in place the hook.

In order that there may be a correct understanding of these things, there is given herewith an illustration of the scaffolding and of the two kinds of stirrups involved, one of the stirrups being referred to as the "old style," which was being used by Stayton, and the other as the "new style" stirrup, which plaintiff contends should have been furnished to him.

Upon the trial a verdict for $5,000 in damages was returned against the Louisville & Nashville R. R. Company, upon which judgment was entered, and to reverse that judgment it is relying solely upon the ground that it was entitled to a peremptory instruction.

At the time of the accident the foreman, Clapham, was some short distance away with his back to the scaffold, and did not see what occurred immediately at the time. The other three witnesses, Basham, Unseld, and Troutman, have each testified in the record, the former for the plaintiff, and the two latter for the defendant, and, as appellant asked for a peremptory instruction, both at the close of the plaintiff's evidence and at the close of the whole evidence, whether it was entitled to the same must be determined from the testimony of these three witnesses.

Basham testifies that on the day of the accident he was working on the same scaffold or staging with Stayton, and that it was at the time swinging only four or five feet from the top of the iron bridge, and the top of the bridge was about 80 feet from the bed of the river below; that the stirrups which he and Stayton were using that day were about twenty inches wide where the ladder went through the center, and made of inch iron; that on that job they had four of the "old style" stirrups and three of the "new style" stirrups, but that both of the stirrups on the staging used by him and Stayton were the old style ones; that the new style stirrup was made of iron a fraction over one-half inch in diameter, and described the difference between the two stirrups as shown in the illustration above; that the old style stirrup was about twenty inches wide at the bottom, and the new style stirrup about sixteen inches; that the ladder which was in use that day did not fill up the whole space in the old style stirrup by about four inches, but was fastened to the bottom of the stirrup with rope.

As to what happened immediately before and at the time of the accident the witness said:

"Q. What warning had you of the accident? Had you any warning of it? A. No. Q. I will get you to state whether or not you all were preparing to and getting ready to move the staging, to lower it? A. Yes, sir; we were going to lower it; that was, he had jarred the scaffold to draw my attention, and I asked him about lowering it myself. Q. And you had decided to lower it? A. Yes, sir; he was ready to lower the scaffold. Q. Is it customary to call the attention of your partner when you are engaged in work to the fact you are ready to lower by shaking the scaffold? A. Yes, sir; he and I

understood it very well, and that is the way we did; I don't know about it being customary, but just our way of doing. Whoever finished last, as the other fellow wasn't looking if we did, we would jar the scaffold. Q. After he gave you this signal you had talked to each other and agreed to lower it? A. Yes, sir. Q. How long after that was it, Mr. Basham, before the staging gave away? A. Well, a few seconds; I couldn't say just how long, just a few seconds. Q. I will get you to state just what happened when the staging fell, which end come loose, and how did it come loose? A. Well, I can answer part of it, and part of it I can't. We had finished; I had my work on my end, and was sitting on the scaffold about two feet from the rope, or two and a half, and he finished his work later and set down and jarred the scaffold to draw by attention as usual; and I looked around and asked him 'was he ready to go down,' he says, 'Yes, I'm ready,' and I seen him reach and touch his rope and turn, and it fell just that quick (snapping his fingers); I lacked about that much of reaching my rope, twelve or fourteen inches. Q. What part of the staging gave way; did anything break? A. Nothing broke. Q. Did the ropes pull out? A. No. Q. I will get you to state what became disconnected about it that caused it to fall? A. Well, the hook in the block come out of the stirrup and that caused his end to fall. Q. Did the blocks remain upon the bridge. A. Yes, sir. Q. The stirrup and ladder that was through it was the only part of the staging that fell? A. It just swung loose; the whole business did not fall, but that end is what came loose and fell. Q. And threw him off? A. He fell off of the end. Q. Your end of the staging held and did not come loose? A. Yes, sir."

He also stated that the old style was not as safe as the new style stirrup, but that up to the time of this accident he had never felt that the old style stirrup was unsafe, but didn't now, since that accident, care to work on them.

The foregoing evidence of Basham was given in a deposition taken and introduced by the plaintiff, but on the trial he was introduced by the defendant, and in addition testified that a few minutes before the accident the staging had been moved from one position to another, and while it was being moved he called Stayton's attention to the fact that the ropes on his end of

the staging were twisted and that the blocks were about half twisted, as it appeared to him, but that Stayton said, "It is my fall line."

On the question of how the hook might be thrown out of the stirrup, he further testifies:

"Q. Now, Mr. Basham, is there any way by which this hook can be thrown out of this stirrup? A. Yes, sir; there is one rope, you can pull it and that will throw it out. Q. Is there any other way you can throw it out? A. I don't know; I didn't know that way could be done until a few days ago."

John Unseld, after testifying, in substance, the same as Basham as to the construction of the staging and the stirrups, when describing how the accident happened, said:

"Q. Now, at the time *that* Mr. Strayton, that this accident happened, tell the jury what happened just previous to that accident? A. Well, he'd just taken hold of the stages. * * * I was on one side and they was on the other, and I looked over and just about the time I looked he was falling; and I hollowed, 'Oh, my Lordy.' * * *"

He further, in testifying about what occurred just prior to the accident, with reference to the twisted ropes, said:

"Well, Clint Troutman said the rope was twisted. I had the staging up over my head a foot and a half and Less (Basham) said he thought the ropes was twisted. Q. He was above? A. Yes, sir; above, leaning down. I say I looked up and said yes, they are twisted and Dick (Stayton) says they are twisted but I will work on it; and I pulled it up, and that was all I said, and Less clum' up and ties it."

In testifying about whether the hook could be thrown out of the stirrup by pulling the wrong rope, he said:

"Q. Mr. Unseld, I'll get you to state to the jury if it is possible to throw that hook out of the stirrup by any swinging motion of the ladder when it is on the stirrup? A. I think not. I don't see how it could be done. Q. Is there any way that that hook can be thrown out by a man handling the ropes? A. Yes, sir. Q. I will get you to show to the jury how a man in handling the ropes himself could throw that hook out of the stirrup? A. (The witness demonstrates to the jury.) Q. Now in undertaking to lower that staging, tell the jury what is the proper way to do that. Which rope is it? A. The

one that is called the fall line. Q. How do you manage to handle the fall rope to undertake to lower that staging or pull it up? Or let it slip? A. Let it slip in our hands. Q. How is that done? A. That way (indicating). Q. And then you make the tie? A. Yes, sir; like this. (Indicating.) Q. Now, then, Mr. Unseld, I will get you to state to the jury which one of those ropes a man can pull that will cause that to come off? A. There isn't but one rope on that block that will do it. Q. Which rope is that? A. That is the rope comes here, back there. Q. Which rope is that? A. (The witness pulls the rope.) Q. Can that be done with a man sitting on it? A. Yes, sir. Q. I will get you to put your weight on this and, show how that can be done? A. (Witness demonstrates to the jury how same can be done.) Q. In doing that did you pull the right rope or not? A. No, sir. Q. The wrong rope? A. Yes, sir. Here is the right rope. Q. You are pulling it down now? A. Yes, sir. Q. I will get you to tell which of those ropes other than the one you could pull would throw that hook out? Just show to the jury? A. (Witness complies with the request of the attorney.)''

Troutman, in testifying about what occurred a short time before the accident about the twisted rope, said:

''A. Well, when he started to pull his staging up I said to him that his rope was twisted. Q. To whom were you talking? A. To Dick Stayton. I said to him, 'Dick, you've got your rope twisted,' and he said no it ain't my rope, it's my fall line; and I agreed with him that it was his fall line that was twisted. Q. Did you see it? A. Yes, sir. Q. What did he say then? A. He said pull it on up, I have to work on it.''

In testifying about the pulling out of the hook from the stirrup by pulling the wrong rope, he said:

''Q. Mr. Troutman, I will get you to state if a man on the ladder can by his own action throw that hook out of the stirrup? A. Well, there is only one way to throw it out. Q. How is that? A. By ketching the wrong rope. Q. Show the jury how that can be done? (Witness here pulled wrong rope and platform fell.)''

As to what happened at the time of the accident he testifies as follows:

''Q. Did you see him when he started to fall, Mr. Troutman? A. I saw him from the time he started until he hit the water. I saw him setting down on his

stage. Q. What was he doing at that time? A. Setting down to lower his stage, I suppose. Q. Did you see him do anything; tell what you saw him do about that time? A. Well, I don't know as I saw him reach up to get his rope to let his stage down. Q. Is that all you saw, and you didn't see that? Q. And you didn't see that, did you? A. Well, I saw him setting down on the stage. I saw him setting down on the stage. Q. But you didn't see him catch hold of any rope, did you? A. Well, yes, sir, he had just reached this way (indicating) the last time I saw him, and that quick it was gone. Q. He didn't have hold of any rope, did he? A. After that started down he didn't. Q. No, before that started down, did he have hold of any rope? Before that started? By the Court: Were you looking at him? Can't you answer the question as to whether he caught hold of the rope or not? A. He had just caught the rope, that was all I could say. By the court: Tell the jury whether or not he had gotten hold of the rope before he fell? A. 'Deed I couldn't say.''

All the evidence showed that nothing about the staging broke; after the accident everything connected therewith was intact, and the only cause of the accident was the hook coming out of or becoming disengaged from the stirrup. The evidence shows that at the time there was about 350 pounds in weight on the staging, and that on Basham's side thereof the hook did not come loose from the stirrup, although it is apparent that when the hook on the other side came loose, and Stayton and that end of the ladder fell, there must have been some considerable jar and jerking upon Basham's end.

Some of the witnesses who were present at the time of the accident stated that the ''old style'' stirrup is not as safe as the ''new style,'' and other witnesses, introduced by the plaintiff, who were not present at the accident, but who qualified as experts, state that the ''old style'' stirrup is unsafe.

So that the evidence, in so far as it was directed at showing the unsafeness of the stirrup used, would have been sufficient to take the case to the jury if the plaintiff had shown that this defective appliance was the proximate cause of the injury. It is not sufficient to show in a personal injury action by a workman that he was furnished an unsafe appliance with which to do his work, but it must further be shown that the unsafe appliance

was the proximate cause of the injury of which he complains.

It will be observed that no witness stated what was the cause of the hook becoming disengaged from the stirrup, and that no fact is testified to by any witness which would have enabled any one to more than speculate or theorize as to how it became disengaged.

The theory of the plaintiff is that the movement of the painter on the staging would have a tendency to cause the hook to become disconnected from the "old style" stirrup, where as it would not cause the hook to become disconnected from a stirrup with an eyelet, as in the "new style" stirrup; that if the "old style" stirrup should come in contact with any part of the structure or bridge, it would have a tendency to cause the disconnection in a stirrup without an eyelet. This argument is based wholly upon a comparison between the construction of the two stirrups, and is not based upon any tangible evidence either that there was any movement by either of the painters on the staging at the time of the accident, or that the stirrup or any part of the staging at that time came in contact with the bridge or anything else. In other words, there is no evidence upon which to base an opinion either that any movement by any one on the staging caused the hook to become disengaged, or that there was any contact between any part of the staging and the bridge which could have caused it.

The defendant's theory is that the accident was caused by Stayton pulling the wrong rope; but that theory is not supported by any evidence as to what rope he did pull; however, as a basis for this argument, the uncontradicted evidence is that a short time before the accident happened the ropes on Stayton's side of the staging were twisted, and that his attention was twice called to it, and by further evidence that by pulling a certain one of the ropes (the wrong one) the hook might be caused to become disengaged from the stirrup.

We, therefore, have a plaintiff speculating as to how the accident happened, without substantial evidence as to how it happened, and a defendant presenting another and different theory about how it happened, without convincing evidence to support his theory. It is certainly liberal to the plaintiff to say that, under this evidence, it is just as fair to say that the accident was caused in the one way as the other.

But courts and juries are not authorized to speculate and theorize, without substantial evidence, as to how accidents are brought about; there must either be direct evidence or such circumstances must be shown as will enable one to determine with some degree of accuracy the cause or causes.

The case of Wiedekamp v. L. & N. R. R. Co., 159 Ky., 674, was where the foreman of a switching crew in attempting to board a moving freight train had slipped or fallen and was killed. The negligence relied upon in that case by the plaintiff was that a ridge of dirt and cinders had been negligently left by the defendant at the place, and that he came to his death by stumbling over this ridge. Discussing the failure of the evidence to show satisfactorily that the ridge of dirt was the proximate cause of his death, the court said:

"Giving to this evidence its fullest effect, and taking every fair inference that may be deduced from it, it cannot be said to show either that the ridge of dirt was the proximate cause of Weidekamp's death, or that it shows with any degree of certainty what was the cause of his death.

"The accident happened about one o'clock in the day, and the evidence is that it was then raining, and it is just as fair to say that he slipped because of the slippery conditions brought about by the rain as that he stumbled over the ridge of loose dirt. From this evidence it is necessarily speculative as to whether the ridge of dirt was the cause of the accident, or whether the slippery condition of the ground was the cause of it.

"Neither courts nor juries are authorized to indulge in speculation or guess work as to the cause of accidents; there must be some tangible evidence from which it may be fairly said what brought about the accident. It has long been the rule in this State that no recovery can be had in such cases where the evidence is so unsatisfactory as to require surmise or speculation as to how the injury occurred, and that there will be no presumption of negligence."

The rule applicable in this case is aptly stated in Stuart v. N. C. & St. L. Ry. Co., 146 Ky., 127, where the authorities are all reviewed:

"A recovery cannot be had on mere surmises or speculation as to how the injury that is complained of happened, nor will it be presumed that the defendant was

guilty of actionable negligence. If the injury may as reasonably be attributed to a cause that will excuse the defendant as to a cause that will subject it to liability, then the well-settled rule is that a recovery cannot be had.''

Applying the rule laid down, as above quoted, to the facts of this case there can be no doubt that the peremptory instruction should have been given; under the evidence in this case the death of Stayton may as well- be attributed to the pulling of the wrong rope, for which he alone was responsible, as to the defective appliance, for which the company was responsible.

The judgment is reversed, with directions to grant appellant a new trial, and for further proceedings consistent herewith.