## Jarboe's Administrator v. Coleman, et al.

(Decided February 25, 1916.)

### Appeal from Pulaski Circuit Court.

1. Master and Servant—Duty of Master—When Servant Assumes Risk.—It is the duty of the master to furnish the servant reasonably safe machinery with which to work, and to use reasonable care to see that it is kept in repair; but where, as here, the servant actually knows of the defective condition, which he himself caused, and the danger to be apprehended therefrom, and continues without complaint to use such machinery, he assumes the increased risk in addition to the ordinary risks of his employment.

2. Master and Servant—Risk Assumed by Infant Employe.—The want of care of an employe cannot be excused on the ground of his youth, where it appears that he was eighteen years of age, intelligent, normal physically and capable of properly attending to the duties of his employment; that he was carefully instructed how to operate the machine at which he was put to work, and had operated it for two months, and also that he not only knew of the defective condition thereof but had been warned by his fellow servants of the danger to be apprehended from its continued use.

.3. Master and Servant—When Evidence Insufficient.—Where the evidence fails to show how the servant lost his life it will not be presumed that the master was guilty of negligence, and where, as in this case, his death may as reasonably be attributed to a cause that will excuse the master as to one that will subject him to liability, then the recovery cannot be had.

EMMETT PURYEAR, ROBERT HARDING, J. W. RAWLINGS, R. B. WADDLE and J. P. HOBSON & SON for appellant.

O. H. WADDLE & SONS and RODES & SON for appellees.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

Bruce Jarboe, a young man eighteen years of age, lacking one day, lost his life in a spoke manufactory at Somerset, Ky., owned and operated by the appellees, J. S. Coleman and R. H. Coleman, as partners under the firm name "Columbia Single Tree Company." At the time of his death and for two months prior thereto the decedent was a factory hand in appellees' employ, engaged in operating a machine called an "equalizer." While so engaged he became entangled in a belt and was hurled against an overhead shaft or pulley and killed. This action was brought against the appellees by the administrator of his estate to recover damages for his death.

The cause of action alleged in the petition was that the death of the decedent was caused by the negligence of the appellees in allowing machinery and appliances at which he was required to work to be and remain in a defective and dangerous condition, which was known by them but was not known by the decedent. The first paragraph of appellee's answer contains a traverse, the second a plea of contributory negligence, and the third assumption of risk; that is, that the death of the decedent resulted from an ordinary risk incident to the work which he assumed in accepting the employment. All affirmative matter of the answer was controverted by reply, thus completing the issues. The trial resulted in a verdict for the appellees, returned by the jury in obedience to a peremptory instruction from the court. From the judgment entered upon that verdict the administrator has appealed.

The machine the decedent was operating when killed was located in an open shed attached to the factory building proper, and was used to make uniform in length pieces of timber or sticks to be later converted into spokes. The machine was composed of two circular saws and a conveyor, the saws being placed opposite each other so that each, when in motion, would at the same time cut an end of the same stick. The conveyor carried the sticks to the saws and through and beyond them into the mill, where they were made into spokes. Each of the circular saws was driven by a leather belt which ran on a pulley attached to an overhead shaft, the shaft being kept in motion by a larger belt running from the factory engine within the building. The conveyor was operated by a canvas belt four inches wide which at its lower end ran upon a thirty-inch wooden pulley

attached to the machine on its left or north side, and at the upper end upon an iron pulley eight inches wide attached to the overhead line shaft. The canvas belt for operating the conveyor was what is known as a cross-belt; that is, the two sides of the belt were crossed half-way between the two pulleys. The line shaft revolved about four hundred times per minute.

The following facts were established by the appellant's evidence and are undisputed: In operating the equalizer the operator was required to stand in front of it about two feet to the right of the conveyor belt, which was on the left side of the machine, and place upon the conveyor chain the pieces of timber which would be carried by the conveyor chain into and through the saws, thence into the mill to be turned into spokes. It was also the duty of the operator to keep his machine oiled, replace any belts that came off and to repair any belt that needed repairing; and when anything went wrong with the machine that he could not himself repair, to report the difficulty to the foreman, who would see that the repairs were made. It was no part of the foreman's duty to inspect the machinery of the factory.

It further appears from the evidence that the decedent's father, J. O. Jarboe, who was appellees' foreman in charge of the spoke factory, of his own accord and without direction or suggestion from appellees employed the decedent, Bruce Jarboe, to operate the equalizer and at the time of doing so fully explained to him how it should be operated, and that for two months prior to his death the machine was properly operated by the latter, who during that time received the wages of a regular hand, namely, two dollars a day. It also appears from the evidence that about five minutes before his death Bruce Jarboe went to his father, appellees' foreman, and obtained of him the key to a room in which extra belts were stored, to get material to repair a belt on his machine. The evidence is silent as to what Bruce Jarboe did after obtaining the key. It shows, however, that appellees' employes near his place of work heard a noise and saw Bruce Jarboe being hurled around the overhead shaft. They immediately ran to his assistance and upon reaching him found that his leg was inside the conveyor belt, which was off the lower pulley, and that this belt and the leg of the decedent had become wrapped around the upper pulley attached to the line

shaft. The machinery was stopped as quickly as it could be done, the belt cut and the body of decedent was taken down.

The pulley on the line shaft around which the conveyor belt and the decedent's leg were wrapped is called a split pulley, because composed of two semi-circular sections which, when joined together, fit around the line shaft. On one edge of the pulley, where the two sections joined, there was a triangular niche or hole in the face of the pulley, an inch in width, a part of which was in each section of the pulley. The edge of the belt had caught in this niche, which caused it to wind itself around the pulley. It could not be told from the appearance of the niche how long it had been in the pulley. It appears from the proof, however, that the line shaft pulley and another which was put in use in the supply room were purchased by appellees about four months before the accident in question. The niche in the line shaft pulley, according to the testimony of W. A. Cundiff, one of appellees' witnesses, was made by the decedent, Bruce Jarboe, about a week before the accident. Cundiff was then assisting Jarboe in putting on the conveyor belt on the latter's machine, Cundiff being at the wooden pulley near the ground and Jarboe at the metal pulley on the line shaft. Failing in their first attempt to put on the canvas belt, the decedent in a fit of anger or from some other unjustifiable cause, took a black-jack spoke and struck the pulley a blow that broke a piece of the metal from the face of it, thereby making the niche therein. Powell, another witness for appellees, passed Cundiff and the decedent while they were attempting to put on the belt and saw the latter break the pulley and heard Cundiff tell him: "You had better have it fixed; it is liable to fray the life out of you." Powell then told the decedent that there was a new pulley upstairs which he ought to have put on, to which the latter replied that he would some day when they were shut down. George Hargis, another employe of appellees, testified that in passing where the decedent, Cundiff and Powell were at the time of the conversation referred to, he heard the warning that Cundiff gave decedent with respect to the niche which the latter had made in the pulley. Cundiff, who gave the decedent the warning, was not the superior but merely a fellow servant of the decedent in appellees' service. He operated a turning machine just

inside the factory, about twelve feet from the decedent's machine and within full view of same. There was no evidence conducing to prove that J. O. Jarboe, appellees' foreman, was ever informed of or knew anything about the existence of the niche in the pulley at his son's machine.

The witness Powell further testified that on a previous occasion he had seen the decedent, Bruce Jarboe, thrust his leg inside the revolving canvas belt and draw the belt off the wooden pulley, and had then warned him that the act was dangerous, and that the proper and a safe way to remove the belt was with a spoke, as by holding the spoke or a stick against the edge of the belt it could readily be thrown off the pulley; furthermore, that at the time of giving this warning to the decedent he told him of an accident that had happened to another boy who had been injured in attempting to draw the belt off the pulley by throwing his leg against it as had been done by the decedent.

After the decedent's body had been removed following the accident, the witness Hopper noticed that a leather belt operating one of the circular saws on the equalizer had been freshly cut and put together again, and he then discovered on the ground near the conveyor belt the pliers which the decedent had evidently used in repairing the belt mentioned.

It is our conclusion that the evidence found in the record wholly fails to show that the decedent's death was caused by the negligence of appellees or any of their employes. It does, it is true, show a defect in the metal pulley attached to the overhead line shaft, and that this defect, a niche, made the operation of the equalizer, at which the decedent worked, dangerous. But as the niche causing the defect in the pulley was made by him, its existence was, of course, known to him down to the time of the accident which resulted in his death, as was also the danger of operating the equalizer with the defective pulley. As to these facts and the further fact that appellees did not know of the defect in the pulley until after the death of the decedent, there was no contrariety of evidence. The defect in the pulley was also known to appellees' employes, Cundiff, Powell and Hargis, because Cundiff was present when the decedent made the niche and Powell and Hargis saw it immediately after it was made and heard Cundiff warn

the decedent of the danger of further using the pulley in its defective condition and advise him to report it to appellees' foreman, that a new pulley might be supplied. Notwithstanding this warning and advice he failed to notify the foreman of the defective condition of the pulley and continued to use it until overtaken by death.

Cundiff, Powell and Hargis, if they thought of the matter at all after the warning from the former to the decedent of the danger of further using the defective pulley, doubtless took it for granted that, as he alone operated the equalizer, he would take enough care for his own safety to inform his father, appellees' foreman, of the defect in the pulley and the necessity of replacing it with one that would be reasonably safe for use. At any rate, it was not made to appear from the evidence that they were under any duty to inform the foreman of the defective condition of the pulley; and if it could properly be charged that they were guilty of negligence in failing to do so, as they, admittedly, were only fellow servants of the decedent, such negligence would not be imputed to appellees or render them liable in damages for the decedent's death.

The question whether appellees are liable for the death of the appellant's decedent must be determined by the rule announced in Pfisterer v. J. H. Peter & Co., 117 Ky., 501, and reaffirmed in numerous later cases decided in this jurisdiction, which, in substance, declares: That a servant, not charged with the duty of inspection, is not required to make a minute or detailed examination of the place where the master puts him to work or of the instrumentalities to be used in performing it, nor to take notice of any defect which would not be apparent to one who usually has neither time nor opportunity for more than a casual, hurried glance at the place of work or the instrumentalities, but is entitled to rely on the master's having adequately discharged his primary duty of using ordinary care to make the place of work and instrumentalities of work reasonably safe for his use; hence, in such case, the master would be liable to the servant for an injury sustained by the latter, caused by any defect in the place of work or instrumentalities, that made them dangerous for the servant's use, unless the defect or danger was so obvious that one situated as was the servant, ought, by the exercise of ordinary care,

to have discovered it. L. & N. R. Co. v. Foley, 94 Ky., 224; L. & N. R. Co. v. Estill, 105 Ky., 461; Cov. Sawmill & Mfg. Co. v. Clark, 25 R., 694; Freestone Co. v. McGee, 118 Ky., 311; Shemwell v. O. & N. R. Co., 117 Ky., 562; Wilson v. Chess & Wymond Co., 117 Ky., 572; Gratz v. Worden, 26 R., 723; McFarland's Admr. v. Harbison & Walker Co., 26 R., 747; Carey v. Samuels, 28 R., 8; Bell-Coggeshall Co. v. Lewis, 28 R., 152; Corley v. Paducah Cooperage Co., 28 R., 451; Cov. & Cin. Bridge Co. v. Hull, 28 R., 1039; Louisa Coal Co. v. Hammond's Admx., 160 Ky., 271; B. & O. R. Co. v. Baugh, 149 U. S., 386.

The rule in question is admirably stated in Bucy's Admr. v. Chess & Wymond Co., 27 R., 198, as follows:

"It must be kept in reasonable repair. The master's duty extends to seeing that the machinery is in that condition of repair, and consequently he must use reasonable endeavor to keep himself informed of the condition. This the master may do by requiring the servant in charge of the machine, where he is competent to do so, to ascertain its condition, and to report it to the master or to the superior in charge, and who represents him. The servant is not bound to increase the hazard of his employment by working at machinery or with tools in unfit condition. By bringing the fact, where it is known to the servant, to the master's attention, the defects can be remedied by the one in authority, or the servant be absolved from the increased risks incident to their use, if the danger is not such as that none but a reckless person would continue their use in that condition. When, however, the servant actually knows of the imperfection, and of the danger it involves to him, and continues without complaint, or without bringing it to the master's attention, he assumes for the time the increased hazard in addition to the ordinary risks of his employment. The law requires the master to do what he reasonably can do toward protecting his workmen in employments dangerous to life or limb. But employers are not omniscient. They cannot actually know the condition of every piece of machinery or tool at every instant of its use. The workman who has it in immediate charge has the best opportunity for learning of such defects as may occur at any moment, and are open to his view. It is the duty to report it so that it can be repaired. If he fails in that duty the master may or may not be liable if some other person is injured by,

it, but if the neglectful servant himself suffers an injury from it, the master having no knowledge of the situation, it is a safe rule that lets the negligent servant bear the consequences of his own action.''

Here the defect in the machinery and the danger to be apprehended from its continued use were not only obvious, but were known to the decedent better than to anyone else, therefore whatever risk attended the use of the machine in its defective condition, though greater than one of the ordinary risks incident to the employment, was assumed by the decedent with complete knowledge of the risk thereby incurred. At the same time, it was a danger from which appellees could not have protected him, because they knew nothing of the defect in the machinery, which want of knowledge resulted from the decedent's negligence in failing to inform them of the defect which had been caused by his further negligent act in striking the pulley with a piece of timber but a few days before his death.

His want of care in the several particulars mentioned cannot be excused upon the ground of his youth, because it appears from the testimony of his father, appellees' foreman, that he was an intelligent young man of normal physical and mental development, capable of properly attending to the duties appertaining to the operation of the machine at which he was put to work, and that when employed and put to work at the machine he was fully instructed by the father how to operate it and had worked at it for two months before his death. As said in Interstate Coal Co. v. Deaton, 148 Ky., 160, a case in which the injury was sustained by a young man seventeen years of age: ''It is the rule that if an employe, notwithstanding his minority, has sufficient intelligence and experience to appreciate the danger of a situation, the rule applicable to adults may be applied in his case.'' It is patent, therefore, that upon the ground thus far considered appellees were entitled to the peremptory instruction directing a verdict in their behalf.

The peremptory instruction was also authorized upon yet another ground. The evidence fails to show how the decedent lost his life; whether his death was caused by the conveyor belt's jumping off the defective pulley and thereby catching his body and wrapping it about the overhead shaft; or whether, in attempting to make some adjustment of the belt, he stuck his leg inside of it while

in motion, as he had been known to do on a previous occasion when warned of the danger of such an act, and thereby became entangled in the belt, cannot be told from the evidence. In other words, the cause of his death is purely a matter of conjecture or speculation. The facts of the case bring it clearly within the rule announced in Stewart's Admr. v. N. C. & St. L. Ry. Co., 146 Ky., 127, and the cases therein cited. In that case it is said:

"But in all cases of this character, where it is sought to recover damages for negligence or wrongful act, there must be some evidence to show that the deceased lost his life through the negligence of the defendant and this evidence must be sufficient to charge the defendant with a breach of duty. A recovery cannot be had on mere surmises or speculations as to how the injury that is complained of happened; nor will it be presumed that the defendant was guilty of negligence. If the injury may as reasonably be attributed to a cause that will excuse the defendant, as to a cause that will subject it to liability, then the well settled rule is that a recovery cannot be had. * * *" McDonald's Adm'x. v. Lou. Car Wheel, etc., Co., 149 Ky., 801; Strock's Adm'r. v. L. & N. R. Co., 145 Ky., 150; L. & N. R. Co. v. Staton's Adm'r., 163 Ky., 760; Dana & Co. v. Blackburn, 121 Ky., 107.

Judgment affirmed.