# Black Mountain Corporation v. Partin's Administrator.

(Decided May 13, 1932.)

B. M. LEE for appellant.

G. G. RAWLINGS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

At about 9 p. m. on July 26, 1928, the plaintiff's decedent, S. T. Partin, received fatal injuries in No. 9 entry of Mine 31 belonging to and operated by the defendant and appellant, Black Mountain Corporation, in Harlan county, Ky. The accident occurred at a point about 200 feet from the mouth of the entry, and not far

from the point where a diverging mine car track ran from the main line, but the switch was turned so as to cause cars coming from the mouth or entry of the mine to take the switch track and not to follow the main one. Decedent and one Patrick, his companion during that day, had, just prior thereto, gone into the mine and were talking to a Mr. Howard, whom the witnesses throughout this record refer to as "the contractor." For awhile, just preceding the accident, Walter Smith, who was the face boss of that particular mine, and also a motorman, was engaged in carrying empty cars into the mine and pulling loaded ones out of it. About sixteen loaded cars had been assembled and Smith started out with them, but before doing so he testified that the deceased and Patrick were not only informed of his purpose to take out the assembled train of that number of cars, but that they also saw him when he left them to perform that task, and that he and Howard then stationed the deceased and his companion, Patrick, by the side of the main track at a safe place beyond the switch, and instructed them to remain there until the train of cars was taken out of the mine by Smith.

Somewhere about the time the motor to that train was approaching the mouth of the mine a coupling link, connecting the sixth and seventh cars from the motor, broke, and, there being a slight down grade toward the switch near the point where decedent and his companion were left, the disconnected cars by their own momentum rolled down that grade, and, as they approached, decedent left the place assigned to him (and which all the proof shows was a safe one) and jumped across the switch track, which was open to receive cars approaching from the mouth of the entry. The space between the face of the entry, along which that switch track ran at that point, and the outer edge of cars on the track, was only a few inches wide, and so narrow as to not safely admit a human body between them. The backing cars ran out into the switch track (the switch being opened for that purpose) and caught the body of decedent between them and the face of the entry, and so crushed him as that he died soon thereafter.

After unsuccessful efforts before the Compensation Board, plaintiff was appointed administrator of the estate of decedent, and brought this action against defendant to recover damages for his death because of alleged negligence on its part in failing to exercise

ordinary care for his safety as an alleged invitee into its mine, and which negligence, as averred, consisted in defective equipment of cars, and mismanagement thereof, whereby the train became uncoupled and the rear cars allowed to roll back and injure decedent as indicated.

The answer denied the material averments of the petition, and alleged that decedent was a trespasser in defendant's mine, and that it owed him no duty while there, except to exercise ordinary care to prevent injuring him after his danger was discovered, and also to not willfully or intentionally injure him. There was also another paragraph in the answer, when first filed, pleading the unsuccessful proceedings before the Compensation Board in bar of the action, and the reply alleged in avoidance of that plea that the proceedings before the Compensation Board were void because it had no jurisdiction under the facts, as set out, to make any sort of finding in that case. The court sustained a demurrer to that part of the reply and dismissed the petition, from which an appeal was prosecuted to this court, and the judgment was reversed in the case of Partin's Admr. v. Black Mountain Corporation, 237 Ky. 556, 36 S. W. (2d) 1. That opinion sustained plaintiff's contention of the absence of jurisdiction of the Compensation Board, and, of course, upheld the averments in the reply to that effect, and reversed the judgment because the trial court had held to the contrary.

It will therefore be seen that the opinion on that appeal dealt only with pleadings; there being no testimony then before this or the trial court. Upon a return of the case a trial was had resulting in a verdict against defendant for the sum of $5,000 upon which judgment was rendered in favor of plaintiff, and defendant's motion for a new trial having been overruled, it prosecutes this appeal, relying upon a number of alleged errors; but we have concluded that it is necessary to refer to or determine only two of them, and which are: (1) That, if the case was a submittable one at all, the court erred in failing to give instructions offered by defendant and erred in the instructions that it did give on the motion of plaintiff over defendant's objection; and (2) error of the court in overruling defendant's motion for a peremptory instruction.

Patrick testified that he and decedent, up to within a few days prior to the accident, had been working in

mine No. 30, belonging to defendant, located in the same territory as mine No. 31, and over both of which one Childers was the general superintendent, the two being separated by about one mile, but located in the same field of defendant's mining operations. When they quit the service of the company at mine No. 30, they were paid off and checked out. Witness says that on the morning of the fatal day he and the deceased went to mine 31 with the view of trying to procure employment as laborers in that mine; but they never mentioned the subject to any one in charge, or apparently in charge, until about 8:30 p. m. that evening, when witness says that they met the face boss foreman and motorman, Walter Smith, who told them that the contractor, Howard, was the one who did the employing for that mine and that he was down in the mine at that time. He also testified that Smith went into the mine with them to find Howard, and they found him in No. 9 entry about 200 feet from the mouth of the mine, and that Howard, with the consent of Smith, then and there agreed to give the two employment beginning the next or some future day, and that while they were talking Smith left and soon thereafter started to pull the train of cars that had been assembled in the meantime out of the mine, with the described result, supra.

On the contrary, Smith and, perhaps, another witness, contradicted Patrick as to how he and deceased got into the mine. Those witnesses stated that Patrick and the deceased were informed that no persons were allowed in the mine, except employees, and that a contract of employment was forbidden to be entered into at night; that Smith told them that he was preparing to make a trip into the mine with a motor for the purpose of bringing out some loaded cars, and that he would speak to Howard and report to Patrick and decedent upon his return, and for them to meet him at the mouth of the mine; that Smith then went to the place on the outside of the mine where the motor was kept for the purpose of carrying it into the mine, and that during his absence the two went into the mine, without his permission or consent, and contrary to the instructions he had previously given them. Perhaps, if the facts were as testified to by Patrick, he and decedent might be classified as invitees while in the mine, and entitled to whatever degree of care the law affords for one occupying such a status.

However, it is not necessary for us at this time to point out the legal distinctions between an *invitee* and a *licensee,* or the distinction, if any, as to the care to which each is entitled. Whatever may be the relative rights of such classes of persons, it is clear that, if deceased and his companion, Patrick, were trespassers while in the mine, then defendant owed them no further duty than to exercise ordinary care to prevent injuring them after their peril was discovered, as well as to not willfully or intentionally injure them. Defendant offered instruction A to that effect, but the court declined to give it, and also failed to give to the jury any instruction defining the relative rights and duties of the parties if decedent was in fact a trespasser, and for which, as we have seen, there was testimony to support. We think it requires no argument to demonstrate that this error on the part of the court was fatally prejudicial, since practically the sole affirmative defense was the alleged fact that decedent was a trespasser and toward whom defendant owed no duty except that which we have hereinbefore pointed out. Instructions B and C offered by defendant related to the duty of decedent to remain at the safe place he occupied when the cars broke loose and started back, and where he then was and would have continued to be safe, and they said to the jury, in substance, that, if he on his own volition left such place and went to the unsafe one where he was injured, plaintiff could not recover. But we have concluded that, inasmuch as an application of the "sudden emergency" doctrine might arise upon a full development of the facts on that phase of the case (but which the testimony in this case leaves meager), if another trial is had, to not determine at this time the propriety of the court's ruling in rejecting those two instructions offered by defendant.

Instruction D offered by defendant told the jury, in substance, that, if defendant exercised ordinary care in the inspection of its cars and all parts of its train, including the coupling links, and that, notwithstanding such inspection as ordinary care required, one of the links, because of a latent defect, broke, as was true in this case, and that there was nothing apparent, or discoverable by the ordinary means of inspection, to indicate its weakened or unsafe condition, then the law was for the defendant, and the jury should so find. It will be noted that the only means whereby plaintiff was entitled

to a submission of the case to the jury on defendant's negligence was by virtue of the res ipsa loquitur doctrine. It is contended by counsel for defendant that the doctrine should not apply under the facts of this case, but we are not inclined to agree therewith, and will discuss it more at length later in this opinion. It is sufficient at this point to say that the offered and rejected instruction related to one of the most vital issues in the case, and which, as we have seen, arose, so far as plaintiff was concerned, by virtue of the doctrine referred to. There was uncontradicted evidence that defendant had made the requisite inspection of the only defective part of its train that gave way on the fatal occasion, and which produced the accident resulting in the death of decedent, and, if the case was to be submitted to the jury at all, there could scarcely be a plainer proposition than the one entitling defendant to the benefit of its inspection as was embodied in its offered but rejected instruction D.

Instruction No. 1, given to the jury on motion of plaintiff, contained much surplus and immaterial matter, and which possessed no legal efficacy. For instance, it called to the attention of the jury the fact that plaintiff was on that occasion employed to work at the mine on the occasion in question, and that he was assigned to a place to work and was given a writing to be approved by some officer, all of which was upon the theory that at the time he was injured he was an *actual* employee in the mine, but which was untrue, even if Howard, or both he and Smith, consented to employ decedent and Patrick and for the employment to commence in the future. Such an agreement, if actually reached, gave to neither of them the status of an employee in the mine; but, under the instruction as given, the jury may have concluded that decedent was entitled to the same degree of care as one who was rightfully in the mine as a present employee. For the reasons stated, we think ground 1 was and is meritorious, and, if the evidence on another trial should authorize a submission, the court will conform its instructions to such expressed conclusions.

The disposition of ground 2 calls for a brief consideration of the res ipsa loquitur doctrine. It was unknown to the ancient common law, and "has been evolved in comparatively recent times." Annotations to the case case of Glowacki v. North Western Ohio Railway &

Power Co., 116 Ohio St. 451, 157 N. E. 21, 53 A. L. R. 1486, the annotation beginning on page 1494 of the A. L. R. citation. It is shown therein, and in section 518, vol. 2, of Jones' Commentaries on Evidence (2d Ed.) that the opinions of the courts recognizing and applying the doctrine are in apparent confusion as to its exact nature and the extent of its effect on the practice of cases in which it is applicable. We employed the word "apparent" in referring to the confusion mentioned, and which was done because of the failure of judges in preparing opinions to employ the precise limiting terms in the definition of the doctrine. Every one agrees that its literal meaning is, "The thing speaks for itself," and it was evolved and given force and effect to meet a precise situation which required its application in order to arrive at justice between litigants in situations calling for its application. That situation was and is: That, where the defective thing or contrivance that produced the injury flowing from such defect is exclusively under the management and control of the one charged with the negligence, and that the accident, resulting in the injury to the complaining litigant, would not have usually and ordinarily happened if the proper care had been exercised by the alleged negligent party possessing such control and management, then the one relying on negligence will be regarded as having established his case on proof of the outlined situation, so as to discharge the general rule of casting the burden on him to prove negligence. Therefore, some courts have, at the expense of exact precision, declared that the rule in cases calling for its application creates a prima facie presumption of negligence which the defendant must overcome. Others, in referring to the effect of the doctrine, say that the above-outlined facts establish a situation whereby the *burden of proof* is shifted from plaintiff to defendant; while a third class declares that the facts calling for the application of the doctrine create a situation from which the jury may *infer* negligence on the part of the one charged therewith, and that from that point he shall "go forward" with his proof in substantiation of the exercise of the proper degree of care on his part. The conditions that we have just described are fully discussed in the annotation referred to, as well as in the citation from the excellent work of Mr. Jones, and also the text in 45 C. J., p. 1193, sec. 768, and following ones.

This court in its opinions discussing the doctrine has been guilty of similar failure of exact definition of the office of the doctrine in cases calling for its application, and has described its effect as creating a prima facie presumption, as shifting the burden from plaintiff to defendant, and as creating only an inference that the plaintiff created in proving the situation whereby he discharged the general burden resting upon him to establish defendant's negligence. We are inclined to the opinion that the latter effect is the one that was intended to be given the doctrine at the time of its inception and when it was evolved, and that conclusion is borne out by our opinions in the cases of Morgan v. Chesapeake & O. R. Co., 127 Ky. 433, 105 S. W. 961, 32 Ky. Law Rep. 330, 15 L. R. A. (N. S.), 790, 16 Ann. Cas. 608, and Watson v. Pullman Co., 238 Ky. 491, 38 S. W. (2d) 430, 431, as well as by a number of cases found in the annotations, supra.

The facts of the Morgan case required the exercise of the highest degree of care on the part of defendant, but that fact only required an increased amount of delinquency on his part over what would be exacted of him in a case where he was required to exercise only ordinary care, and which difference has no effect upon the true scope and application of the res ipsa loquitur doctrine. The opinion in the Watson case expressly said:

> "Res ipsa loquitur—the thing speaks for itself —is but a terse way of declaring that the circumstances attending an accident are of themselves of such character as to justify an *inference* of negligence on the part of the one having control over those circumstances." (Our emphasis.)

The same limiting effect and scope of the doctrine is found in the opinion in the case of Wright v. Elkhorn Consolidation Coal & Coke Co., 182 Ky. 423, 206 S. W. 634.

But, whatever may be the true and precise effect of the res ipsa loquitur doctrine under facts calling for its application, courts hold generally that, if the one charged with negligence "goes forward" with his testimony and establishes the exercise of the proper care on his part, and thereby completely overcomes the *inference* to be drawn by the jury from the testimony produced by the plaintiff, then the "inference" of negli-

gence is wiped out and destroyed, and defendant is entitled to a directed verdict. On this precise point the text in 45 C J., 1928, sec. 857, says:

"But, where the possible inference of negligence is clearly overcome by unisputed evidence to the contrary, the case must be withdrawn from the jury."

In note 95 to that text the writer thereof cites some United States opinions, and cases from Alabama, Arkansas, Florida, Georgia, Michigan, Mississippi, Missouri, Nebraska, New York, North Dakota, Pennsylvania, Utah, and Wisconsin. We have examined most of them, and find that they sustain the text. See also Stephenson v. Smith Motor Coach Co., 243 Ky. 153, 49 S. W. (2nd) 1014. But, in order for that rule of practice to apply, the overcoming proof introduced by the one charged with the negligence must be undisputed and uncontradicted by any testimony or circumstance refuting it.

As has already appeared, the only defect to any of the parts of the outgoing coal train in this case, and which caused the separation of the cars and the rear part of the train to roll back into the mine, was a broken link used in coupling one car to another. It was uncontradictedly proven that the broken link was examined on the spot and immediately after the catastrophe, and that no detectable fault was found in it. It was also proven, in general terms, that not only the coal cars, but likewise their couplings, including the links, were examined and inspected at reasonable intervals, and that such component parts of this train were recently inspected, including the coupling links of its cars, and that no defect was found in any of them, and that they were found to be in an apparent safe condition. The break in the particular link involved was fresh, and there were no outward signs or indications of any faulty condition. That testimony was undisputed, and it is not attempted to be refuted by any other introduced at the trial, nor does counsel for plaintiff urge any refutation of it, except that the jury might have found that the witness who testified to it swore falsely. If there were proven circumstances to support that argument, a different case would be presented; but, in the absence of any express or circumstantial testimony to refute it, we know of no rule of law that would require a court of justice to discard it, or to allow a jury to do so by submitting the

question to it. It is therefore our conclusion that under the facts as disclosed by the present record, and regardless of the status of deceased toward defendant, the court erred in not sustaining its motion for a directed verdict in its favor, and for which reason also the judgment should be reversed.

Wherefore the judgment is reversed, with directions to set it aside and to grant the motion for a new trial, and for proceedings consistent herewith.