## Kentucky Utilities Co. v. Guyn's Adm'r.
### Nov. 21, 1939.

Gordon, Laurent, Ogden & Galphin and Frank Carr for appellant.

J. D. Via for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

During the morning of August 6, 1937, William Frank Guyn, 19 years old, was working in the hay field on his father's farm with his father and brother-in-law. He left them to go to the house of a neighbor, Sam Byrd, apparently to get some water. He cut across Byrd's ten-acre field. After a few minutes the unusual lowing and disturbance of some cattle attracted the attention of the father and brother-in-law, and the latter went over to see what was the cause. He found young Guyn in a semi-conscious condition, with his clothing afire, about twenty feet from some poles carrying high tension wires of the Kentucky Utilities Company. He died that afternoon about six o'clock. His body was burned down one side, with his hands and feet especially so. Guyn's administrator sued for damages for his death. Negligence was charged in constructing and maintaining

ground wires on the defendant's poles and thereby permitting them to become charged with electricity. It was alleged that the decedent had become entangled in such a wire and electrocuted. Judgment for $2,000 was recovered.

It is claimed on the appeal only that the defendant was entitled to a peremptory instruction. The argument is that Guyn was a trespasser to whom the company owed no duty, and that there is no evidence tending to establish negligence on appellant's part. In view of our conclusion that the second point is well taken, we do not consider the first one.

The defendant has an easement across Byrd's land for the erection and maintenance of its line. Near the point where young Guyn was found it had what is described as an ''H'' structure, carrying the transmission lines. This consisted of two cedar poles 42 feet above the ground, 10½ feet apart, with a wood cross arm one foot below the top joining the two poles and extending approximately five and one half feet beyond each pole. Three wires conducting electricity were attached to the lower ends of 39-inch porcelain insulators, affixed to and suspended beneath the cross arm. One was midway between the poles and the other two near the ends of the cross arm, and five and one half feet from the pole nearest to it. The lines were 37 feet above the ground and carried current of 66,000 volts. On each pole was a ground wire consisting of No. 6 copper wire running down the pole eight feet into the ground, where it was coiled under the pole. Above the ground and along the side of the pole to a point near the top staples two and one half feet apart held the wire against the pole. Four staples secured the wire at the top. The wire extended about two inches above the pole so as to serve its purpose better. The purpose was the same as a lightning rod, to protect the pole and equipment from lightning by grounding it and to prevent static disturbances during lightning. This ground wire had nothing whatever to do with conducting electricity. It was five and one-half feet away from the nearest point at which there was any electric current. The only way in which it could have become charged by the current was by being loosened and brought in contact with or very close to one of the voltage wires by the operation of some outside or unrelated force. If it were pulled loose up to the top of the pole and then flipped or jerked very close to

or against one of the voltage wires it would, of course, become charged.

Shortly after the boy was discovered it was found that the wire on the east pole of the "H" structure had been freshly twisted in two near the ground and the staples up the pole had been pulled out, leaving the broken wire hanging loose. One witness, who went to the field within a short time, testified that the wind was whipping the wire around the pole, but all the other witnesses say there was no wind. The brother-in-law of the deceased testified that the poles had marks on them, both new and old, as though made by single trees of wagons or other vehicles. However, it is conceded that at the time of the accident the field was not in cultivation but was grown up with briar patches and was being used as a cow pasture. The poles had become sun cracked and the staples holding the ground wire could be easily pulled out.

A witness, who had worked for different companies in erecting transmission lines, gave his opinion that a molding should have been put over this ground wire so that no one would have come in contact with it, and that it was improper construction to leave the wire uncovered. He admitted that it was unusual so to cover the wire in open places like this. The overwhelming testimony of qualified witnesses is that this was a proper and safe construction. But if it should be conceded for the argument that the opinion of the plaintiff's witness (whose qualification is very doubtful) that this was negligent construction, the fact remains that the circumstances show that such was not the proximate cause of the young man's death. It is apparent that the wire in place was harmless and that the unfortunate accident could not have been caused had the wire remained in place. If it occurred because of the alleged negligence of omission in the matter of maintenance rather than because of any negligence of commission in the original construction, the defendant could not be held liable unless it was shown that through its proper agents it knew of that defective condition, actually or by imputation, such as by its continued existence for a period of time that in the exercise of proper care it should have known of it. Louisville & Nashville Railroad Company v. Bell, 276 Ky. 778, 125 S. W. (2d) 239. It is undisputed that some one had recently twisted the wire in two and then jerked or pulled out the staples holding it against the pole. The fresh condition of the wire and the wood

showed that. There is not the slightest kind or degree of evidence that the defendant had knowledge of this, actual or imputed. The res ipsa loquitur doctrine cannot apply to the facts of this case to supply either presumption or proof of negligence. Watson v. Pullman Company, 238 Ky. 491, 38 S. W. (2d) 430; Black Mountain Corporation v. Partin's Adm'r, 243 Ky. 791, 49 S. W. (2d) 1014; Cf. Dunning v. Kentucky Utilities Company, 270 Ky. 44, 109 S. W. (2d) 6.

The appellee, in his argument, does not even suggest any theory as to how the accident occurred, but contents himself with saying that the appellant did not establish its theory that the young man jerked the wire loose and carried the end out to about the point where he was found, some twenty feet away, and there flipped it or in some other manner brought it against or close enough to the charged wire to permit the jumping of electricity to the wire in his hand. The defendant did not have to establish non-liability under the facts adduced by the plaintiff.

As said in Spencer's Adm'r v. Number Four Superior Coal Company, 228 Ky. 799, 16 S. W. (2d) 168, 169:

"This case comes within the well-established rule that where damages are sought for injury on account of negligence, it is incumbent upon the plaintiff to establish both the injury and negligence, and, if under the evidence the injury may as reasonably be attributed to some cause independent of negligence for which the defendant would not be responsible as to negligence, the case should not be submitted to the jury."

While it is manifest that the decedent was killed by the defendant's electricity, the case is well within the rule thus stated in Fee's Adm'x v. Mahan-Ellison Coal Corporation, 241 Ky. 231, 43 S. W. (2d) 681, 683:

"Where the circumstances attending the injury or death of the employee show nothing as to the real cause thereof, but leave it merely to conjecture or guess whether it was the negligence of the master or fault of the servant or an unaccountable accident, there is failure of proof. The cause thereof must be proved. Unless it is shown affirmatively, there can be no recovery."

563

This case is like that of State ex rel. Missouri Public Utilities Company v. Cox, 298 Mo. 427, 250 S. W. 551, in which it was held the defendant was entitled to a directed verdict. That is our opinion.

Wherefore, the judgment is reversed.