## Simpson's Adm'x v. Green Silvers Coal Corporation.

Dec. 8, 1943.

Golden & Lay for appellant.

J. C. Baker for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

James Simpson met his death in appellee's mine. His widow, as administratrix, filed petition charging that while decedent was engaged as a coal loader and "was returning from his place of work, he was killed by a mass of falling slate, all due to the negligence of the employer." She sought recovery in the amount of $10,000. She charged, as was true, that at and before the time of his injury the company though eligible had never accepted the terms of our compensation laws. Appellee, first denying, plead that the alleged injuries were brought about by the sole negligence of deceased. An amendment alleged specifically that decedent was never employed by the company, and that he was not in its employment at time of injury. Replies and record controversion completed issues. Following proof by plaintiff, the court overruled appellee's motion for a favorable verdict. This motion was renewed after introduction of defendant's and plaintiff's rebuttal testimony, and the court directed as follows: "You have heard all this evidence. The plaintiff had to plead and prove that James Simpson was employed to work in that mine; unless he was employed the company was under no obligation to him, and could not be negligent if he wasn't employed. The only evidence that the plaintiff showed as to his employment was that he had a check number; that he went in and came out with No. 17 metal check which they used putting on mine cars loaded with coal, but the mine foreman swears he never saw the man and never employed him. Middleton swears he had to approve all men before they go into the mine, and he said he did not employ him. The bookkeeper swears he did not give this man any check number, and his name did not appear on the register. The burden would be on the plaintiff to prove his employment, and failing to do that I feel it my duty to have you write a verdict for defendant."

The only question we have to determine is whether or not the court was in error in withholding submission; appellant insisting that where there is evidence of substance supporting the claim of negligence, the matter should be submitted to the jury, and appellee contending that the court properly sustained the motion for a directed verdict. The argument necessitates a summary.

Simpson was a colored man about thirty-one years of age at the time he was killed, and had engaged in mine work theretofore. It was well enough shown that the company, when it employed a new man, furnished the employee with numbered metal discs to be placed on the car which he loaded; when the car came out of the mine for weighing the disc would be removed and its number reported to the office for the purpose of giving credit to the loader of the particular car. This disc seems to have been a sort of passport to the mine. Tom Love, an employee, testified that on the evening of the injury he and Simpson were around the company's office, and Simpson went in and came back and showed him his "numbers," which he said was "17." He said they "fooled around and somebody got up to ask us to work." He did not know who it was; whether he was a member of the company or not. "We decided we would go to work that Saturday night and Sunday night to load 80 cars of coal." He said at that time Millard Hobbs was the "boss," and had seen the two in the bath house. He said Charlie Pitman and B. Weathers directed Simpson where to go and work. Weathers was a coal loader; Pitman a motorman.

Love and Simpson went into a cross entry on Pitman's motor. Due to slate falls the power wires were down, and "we decided to come back out; there was too much cleaning to do." The motorman said: "It looks like we will have to go back and not work." He and Simpson were sitting in the third empty car, and "all at once the slate fell and knocked me unconscious." After he "came to himself" he heard Simpson call for help. Simpson died before the mass of slate was removed. He said that Simpson had a pick and shovel, which he had gotten from another coal loader. He makes it plain that Pitman (motorman), "while the bunch was setting around talking, said they wanted us to go in and load 80 cars of coal Sunday and Saturday night. Pitman told us to tell that boy where to work. That night he was overseeing." He said he had a number, the same kind Simpson had.

Appellant testified that she went to the mine on Monday after the injury on Saturday to get her husband's clothes from the bath house. It was locked; she went to the office and asked the bookkeeper for "Jim's social security number. He tore off a piece of paper and wrote his name and number on it." She then went

back to the bath house, got his clothes and found his security card, which bore the same number given to her on the paper. She did not know the man who gave her the number.

Weathers said he was a coal loader and helping to run the mine by "getting men and carrying them over there and placing them and helping Mr. Middleton out." He told the men where to work. "If they needed men I would get them over there and tell them Mr. Theodore would pay them. The bookkeeper told me to do this." He says he took Simpson over to the mine. "I knowed he would get the job, and he went to work and left his tools at my house." He showed him room No. 12, where he was to work. He then states what caused the failure to work, and about the slate falling. Simpson had on his work clothes, "lamp and everything like I did," and he told him to go to Mr. Barton and sign up. He went into the office and later he saw him with the check. In describing the accident he said they had run into two falls, and as the motor proceeded the pole jumped and whipped against the top; it had been raining and the top was slick. The motor ran about three car lengths; stopped and the motorman put up the pole and the rock fell. Weathers had theretofore noticed the rock and told the motorman he had better take it down. This was some time before the rock fell. Cook was boss of the night shift, but was not around that night.

Middleton, president of the corporation, general supervisor and manager of the mine, said all employees had to be approved by him. He knew nothing of the employment of Simpson, as he was out of town until the Sunday following the accident. He had never heard of him or knew of his being around the mine until after the accident. No one had told him of Simpson going to work. When men were employed they kept a list on the pay roll. After applying for work applicants were examined by the doctor, and he then approved, and the applicant then gets a number from the book-keeper or script writer. The company had check numbers running "from 1 to 100 and something. When a man got his number he was ready to be placed by the foreman."

On cross-examination he said he saw, but did not check the records every day, and didn't know what

happened "that Saturday;" that the motorman looked after the night crew, and no one had authority 'over the men at night "except the motorman exercised authority." The motorman said he asked Simpson who hired him, and he, without objection, replied "Mr. Hobbs." He had asked Love where Simpson was going to work, and he said he was to work with him. Simpson had no tools but "was aiming to use tools of some others." He said the day boss was in charge of the night men and the crew, but he was not there that night; "I would tell them what to do."

Austin Pyle was script writer, and did not know Simpson was working at the mine. "Some fellow come in and asked if we were hiring men and I told him I did not know." He said no woman came into the office and asked him about a social security card. He said that he did not give Simpson a check number. The custom as to giving check numbers was as stated by Middleton. Barton had never heard of Simpson. Millard Hobbs was the check mine boss, and employed help. He gave an order to be signed up and Middleton had to approve. He said the same as Middleton about physical examination and approval. He had never seen Simpson until after his death, and said he did not hire him or tell him where to work. "The motorman was supposed to show the man where to work if he was employed," but he was not on the job at the time Simpson was killed. He had put the motorman in charge, which was his custom when he was not around. Barton, the bookkeeper, said that some colored woman came to the office, but he did not give her Simpson's social security number because he didn't have it; nor did he have his name.

The court in disposing of the initial motion for peremptory was of the opinion that plaintiff had made a case for the jury and we think he was correct. Counsel for appellant contends that under our ruling in Terrell v. Southern R. Co., 225 Ky. 645, 9 S. W. (2d) 993, the court could not consider the evidence of defendant on motion for peremptory, if the evidence is contradictory, or, as stated, unless it helps the plaintiff's case. We need not enter into a discussion of that rule, 'nor the rule in the Nugent case, which abolished the scintilla rule. Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877. Here we have a case where the evidence of the plaintiff sufficiently showed that Simpson had a

passport to the mines; that persons having authority to procure men to work, and undoubtedly to place and direct them where to work, had taken him into the mine.

It appears to be a case of operation of a small mine (nine men shift at night) with certain rules as to employment, which were not always observed, but with supervisory and directory powers left to several subordinates. The testimony of Middleton evidences the fact, and he does not say that he objected to the exercise of authority. One witness says that Simpson said that Hobbs hired him, which Hobbs denied, saying that he had never seen Simpson. The latter had the passport to the mine, and it is only surmised that he may have gotten it surreptitiously, or was using a check of some other mine. It is true that the office men testified that they had never seen Simpson, yet the proof that he went into the office looking for work, and came out with numbers, was sufficient to take the question of employment, or contra, to the jury when bolstered by the evidence that he had been told to work and given directions where to work by employees, who assumed authority without objection. The two cases cited by appellant as bearing on the question of sufficiency of proof of employment are not of any benefit. In Black Mountain Corporation v. Partin's Adm'r, 243 Ky. 791, 49 S. W. (2d) 1014, the injured man was not only not employed, but had been told not to enter the mine. In Dickerson v. Bornstein & National Concrete Const. Co., 144 Ky. 19, 137 S. W. 773, we held that the facts did not show a right to recover under the petition because there had been no semblance of employment. Nearly every case presents a different set of facts, and each must be decided on facts in the particular case. We are of the opinion that here there was sufficient substantial evidence adduced to require submission.

Judgment reversed with directions to grant appellant a new trial.