## Wright, Administrator v. Elkhorn Consolidation Coal & Coke Company.

(Decided December 10, 1918.)

### Appeal from Pike Circuit Court.

1. Master and Servant—Duty to Furnish Reasonably Safe Appliances. —The master is not bound to provide the very best materials, implements or accommodations which can be procured, nor those which are the most convenient or the safest. His duty is sufficiently discharged by providing those of the class which he is required to provide that are reasonably safe and fit, since he is not bound to furnish every new improvement or invention before the question of its safety has been determined by actual test and found suitable for the purpose. If he uses such devices and appliances as are usual and known in the business from actual test to be the most suitable, he has complied with his duty.

2. Master and Servant—Safe Place to Work.—A master is only required to exercise ordinary diligence and care in providing a safe place in which his servant is to perform his duties, and safe tools and implements for him to use in the performance of such duties, and if notwithstanding the exercise of such diligence and care an accident happens which could not be anticipated, discovered or guarded against by ordinary care, the injury to the servant resulting therefrom will be regarded as one of the risks of the business and assumed by the servant.

3. Master and Servant—Mines and Minerals—Safety Devices and Switches—Question for Jury.—Whether a coal company sufficiently complied with the requirements of subsection 11 of section 2726 of the Kentucky Statutes with reference to safety devices and switches to prevent cars from running away on its inclined planes is a question of fact to be determined from the evidence, and where the jury found, under proper instructions from the court, that the devices used complied with the requirements of the statute, and which finding is supported by the testimony, the verdict will not be disturbed.

4. Master and Servant—Mines and Minerals—Safety Devices and Switches.—Although the devices, as well as derailing switches,

may not be located upon the steepest part of the inclined plane, this fact does not show a non-compliance with the terms of the statute if the evidence shows that the devices as well as the places of the location of the switches are the safest that can be provided and are the most suitable and effective to accomplish the purpose intended by the statute.

O'REAR & WILLIAMS and JAMES CLAY for appellant.

ERNEST WOODWARD, ROSCOE VANOVER, J. J. MOORE, J. S. CLINE, CLINE & STEELE and CHILDERS & CHILDERS for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Adam Wright, a young man who, according to the proof, was between 20 and 21 years of age, was employed by the appellee and defendant below, Elkhorn Consolidation Coal & Coke Company, whose superintendent was Lon Rogers, and whose mine foreman was John Jones. The defendant corporation was engaged in mining coal, The mouth of its mine No. 2 was upon the side of a mountain, from which it let the coal down an incline to its tipple which was built in the gulch between two mountains. The deceased was called a dumper, his duties being to receive the cars in the tipple after they came down the incline and to empty them and start the empty cars back to the mouth of the mine up an incline of another track provided for that purpose.

On November 13, 1915, at about nine o'clock a. m., a car of coal broke loose near the top of the incline, just over that part of it called the knuckle, and it with its contents and the device provided for holding it, called a barney, ran down the incline, striking the tipple with such force as to demolish a portion of it, and killing the deceased. His father, the appellant and plaintiff below, qualified as his administrator and brought this suit in the court below against the corporate defendant, its superintendent and its mine foreman, to recover damages which the estate of deceased sustained by reason of his death, fixed in the petition at the sum of $30,000.00.

The negligence charged is threefold, being (1) the failure of the defendants to furnish deceased with a safe place in which to perform his work; (2) failure to furnish him with safe tools and appliances with which to do his work, and (3) that defendants failed to comply with the provisions of subsection 11 of section 2726 of the pres-

ent Kentucky Statutes, whch is an act of the legislature passed at its 1914 session, and which says:

"The operator or superintendent shall direct and see that safety blocks, or some other device, are constructed for the purpose of preventing cars from falling into the shaft or slope, or running away on slopes and inclined planes; and safety switches, drop-logs, or other devices, shall be used on all slopes and inclined planes; and the mine foreman shall see that said safety blocks, safety switches, or other devices are maintained in good working order."

The answer traversed all the acts of negligence charged, and affirmatively pleaded assumption of risk and contributory negligence, which, being denied, made the issues, and upon trial the jury, after receiving instructions of the court and hearing the argument of counsel, returned a verdict for the defendants, and to reverse it the plaintiff prosecutes this appeal.

The grounds upon which a new trial was asked in the court below seem to be almost a literal copy of those set out in section 340 of the Civil Code, but in this court the contentions of counsel representing appellant seem to be that the court erred in submitting to the jury the issue as to whether defendant had complied with the section of the statute, *supra;* that it erred in giving to the jury instructions A, B and C on its own motion; that it erred in rejecting testimony offered by plaintiff, and that the verdict is not sustained by sufficient evidence. These several contentions will be considered and disposed of as we proceed with this opinion.

At this point a statement of what might be said to be the undisputed facts is appropriate. At some little distance from the mouth of the mine on the track over which the cars traveled carrying the coal to the tipple is that portion of the track called the knuckle, which is described to be the point where the track enters what is called the plane or incline, which in turn is explained to be the steepest part of the incline from the mouth of the mine to the tipple, and in this case was on an angle of about 30 or 33 degrees and about 350 feet long, the tipple being about 170 feet below the mouth of the mine. In mining parlance a slope is shown to be that portion of the track located within the mine, while an incline is that portion of it outside of the mine. The defendant company operated, lowered and elevated the cars running

over its incline with the use of a barney. This was a contrivance made of six pieces of sound timber each 10 inches square, bolted and fastened together so as to make a solid piece about 60 inches long, 20 inches wide and 30 inches high, located upon wheels which were on square axles bedded flush with the bottom surface of the barney. A one-inch plowsteel rope consisting of six strands of nineteen wires each went through the barney diagonally, entering it from the bottom just behind the front axle and coming out near the rear end of the top, at which place it was fastened by a loop with two clamps, and the loop was held to the top surface of the barney by the use of nails. In operation the steel rope was manipulated by means of a drum, located near the mouth of the mine. The tracks upon which the coal car ran were 42 inches wide, but within the rails of those tracks was another track 30 inches wide, upon which the barney ran, and this last mentioned track just before or about the time the entry of the tipple was reached continued on an incline through what is called the barney hole, so as to permit the barney to pass under and below the coal car track upon which the coal car would run into the tipple and be unloaded, when it would then be pushed over the barney hole so that the barney could come up behind it and take it up the incline to the mine. Between the mouth of the mine and the knuckle there were located switches which were automatically operated by the barney as it approached the knuckle at the top of the incline. In other words, with the use of these switches no loaded car could pass over the knuckle without the barney being there to receive it. The tracks on the incline were upon the surface and were filled in between the ties, which the evidence shows was necessary to hold them in place, and the steel rope ran loose upon the track. It had been purchased about the first of the year in which the accident occurred, and is shown to have been of the very best make and material. Its vertical lifting strength was about 250,000 pounds and its safe operating strength was as much as 75,000 pounds, but at the time it broke it was carrying only 4,500 pounds, being the weight of the coal, coal car and barney on the angle of the incline about thirty or thirty-three degrees, which, according to the testimony, would be equal to about 1,500 pounds on a vertical lift. The breaking of the rope occurred within the

barney, between six and twelve inches from the loop at the rear end of its top surface.

Turning now to the contentions made by plaintiff on this hearing, it is insisted by his counsel that the facts as just related do not furnish a compliance with the provisions of the section of the statute, *supra*, while the contrary is insisted upon by defendants. The statute, in substance, prescribes that the operator or superintendent shall provide safety blocks "or other device" to prevent the cars from running away on the inclined planes, and that safety switches, drop logs or other devices shall be used on all inclined planes, and that it shall be the duty of the mine foreman to see that such named devices, or others, are properly maintained in good working order. There is nothing in the statute requiring that any of the devices named, or others which might be found proper for the purpose, shall be installed at any particular point on the inclined plane, but only that they shall be so constructed as to prevent (not absolutely, but as far as possible) the running away of the cars on the inclined plane.

Plaintiff insists that either some of the devices mentioned, or others mentioned by some of plaintiff's witnesses, should have been provided so as to stop the runaway car while on the steep part of the inclined plane, and he insists that such was the intention of the statute and that the barney does not comply with the requirements thereof. To this end it is contended by plaintiff that there should have been constructed at some point on the inclined plane derailing switches so as to divert the course of the runaway car and to prevent it from running into the tipple; and further, that there should have been a system of devices, which is called in the evidence grabhooks, installed either on the car or the barney, so as to permit them to become released when the rope broke, and to catch in the crossties or some other place during the runaway and thereby stop the car.

In the first place we do not think the statute susceptible of such a construction, since it does not prescribe the use of all possible or imaginable devices that might or might not prevent a catastrophe, but it provides only for the use of devices to prevent (as much as possible) the cars running away on the inclined planes. It is shown by the overwhelming weight of the evidence given by those of long practical experience in this character of mining that neither grabhooks nor derailing switches are prac-

ticable. On the contrary, the same weight of testimony is to the effect that on surface tracks grabhooks would be of no service, since there would be nothing on which the hooks might grab so as to hold the car. It is further shown that it is extremely doubtful whether they would hold a car running down a plane as steep as this one, even should the hooks succeed in getting a firm hold. Moreover, it is not shown that such devices are used among the operators of mines as a practical or feasible proposition, except perhaps in one instance where the incline at that mine is a trestle, furnishing an opportunity for the hooks to operate. No instance is shown where hooks like those contended for ever stopped a runaway car. Their safety, as contended for by plaintiff, rests entirely in speculation.

The same is true with reference to derailing switches located at some point along the incline. Manifestly the safety of such derailing switches, if any, would consist in diverting the runaway car from the regular track of the incline, causing it to wreck itself at the side. The value of such a device, if effectual for the purpose at all, would largely depend upon its location, for it could serve no purpose if the car got loose after it passed over the point where it connected with the inclined plane. Furthermore, it is indisputably shown by expert mine operators that such a derailing switch, wheresoever located on the inclined plane, would be of no practical use because the momentum of the car would cause it to continue in a straight direction and not take the derailing switch, conceding that its connection with the incline was clear and free from all obstructions produced by lumps of coal dropped from the cars during their regular operation, or from other causes.

Indeed, a physical fact appears in this case going to substantiate the testimony of the experts with reference to this point. It is that the runaway car in this case jumped the track at a slight turn in it about 31 feet from the tipple, continued in a straight direction and descended in that distance only about 18 inches. It is not to be presumed that the legislature intended to provide for the impracticable, and we conclude that the court pursued the correct course when it submitted to the jury in an instruction drafted and offered by the plaintiff whether or not defendants had complied with the statute in the

construction of the safety switches heretofore alluded to, and in the use of the barney.

By the same character of evidence referred to it is shown, even by some of plaintiff's witnesses, that the barney is the safest device known to mining, in this character of operation. All other elements of danger are removed save and except the breaking of the steel rope. If the rope had to be attached to each car as it made the trip down the incline there would be the element of human forgetfulness. The attachment might be defective, or improperly made. The clevices and pins used in making the connection might be defective or improperly adjusted, and the rod running through the car to which the attachment would be made might become loose; lastly, the car itself is shown to be subject to rapid decay by chemical processes. All these dangers are removed with the use of the barney, provided the rope is securely fastened to it. We therefore conclude that the jury was abundantly authorized from the evidence to find as it did that the barney was not only a device within the contemplation of the statute, but further, that it was perhaps the safest one which possibly could have been provided.

Considering now briefly the testimony in regard to the breaking of the rope, we have already shown the character of the rope, as well as its strength. The life of that character of rope is shown to be somewhere between five and seven years. It had been in operation something like eleven months at the time of the accident. Much evidence is introduced in regard to its inspection, exposure and condition along that portion of it which passed over the inclined plane, but we need pay no attention to that, since the break occurred within the barney. No complaint is made of the fastenings, since they were perfectly secure. It is shown that the rope at the breaking point, notwithstanding it was encased in the barney, was regularly inspected every two weeks, which, under the testimony, was even more often than ordinary care and prudence required. True, it is argued that one witness said that the rope should be inspected daily, but upon cross-examination he explained that he meant that part of it which was exposed and which ran over the track, and not that portion within the barney. A piece of the rope where it broke, taken from the long end, was exhibited upon the trial, but the other or short end

seems to have been lost and was not produced at the trial. At least one witness testified that he examined the break as shown by the short or lost end of the rope not long after the accident, and that he thought he saw evidences of rust on some of the strands of wire out of which it was made, but he was finally made to say that he did not know whether it was rust or dirt. Nor was he positive that the rope which he examined was a part of the one that broke. Other witnesses testified as to the appearance of that portion of the rope exhibited at the trial, stating that it appeared to be fresh, with no indications of a former breaking, or any other defects. The character of rope which defendants were required to furnish, together with the care required of them in inspecting and keeping it safe, was submitted to the jury by instruction No. 4, given at the instance of plaintiff, and its finding on that issue is likewise abundantly sustained by the evidence.

Complaint is made of instructions A, B and C, given to the jury at the instance of defendants. Instruction A, in very apt language, submitted to the jury the assumption of risk by the deceased, and told the jury that if the accident was caused by the ordinary risk of the employment and not by any negligence as defined in previous instructions, then it would be their duty to find for the defendants. No serious complaint is made of this instruction, nor indeed could there be, in view of the many opinions of this court applying the assumed risk doctrine.

Instructions B and C are in these words:

"B. If the jury should believe that the defendants used care in purchasing the rope of the grade, kind and material generally used by careful men in like business, and the break therein was caused by defective manufacture or hidden defects not discoverable by an ordinary careful inspection, then the law is for the defendants and the jury should so find.

"C. The court instructs the jury that if they should believe that the death of Adam Wright was caused by an accident not traceable to the negligence of the defendants, and that by the term accident is meant an unusual and unexpected event happening without negligence, then the jury should find for defendants."

We are unable to find any criticism of either of those instructions unless it be, as argued, that instruc-

tion C excusing defendants if the cause of decedent's death was purely accidental should not have been given. But we do not fully grasp counsel's criticism of this instruction. It did not relieve the defendants of liability except in the event that the car was caused to run away unexpectedly and without any negligence on the part of the defendants.

This court in a number of cases has held that before a master would be liable to his servant for injuries it must be shown that the injury was caused from some neglect on the part of the master, or on the part of some servant whose negligence could be imputed to him, it not being enough merely to show that the servant was injured while in the service of the master, and in the case C. & O. Ry. Co. v. Walker, 159 Ky. 237, it is said:

"Where the circumstances attending the injury show nothing as to the real cause, but leave it to conjecture as to whether it was the negligence of the master or the fault of the injured servant, or an unaccountable accident, there is a failure of proof." In the same case it is also said (and which applies to the contentions of plaintiff hereinbefore discussed) that: "A master is not required to furnish the servant absolutely safe appliances with which to work. He discharges the full measure of his duty when he exercises ordinary care to furnish appliances which are reasonably safe. When, therefore, the servant seeks to recover for an injury growing out of defective appliances, the mere fact that a piece of machinery breaks is not of itself sufficient to make out a *prima facie* case. It must, therefore, appear that the master knew of the defective condition of the machinery, or could have known it by the exercise of ordinary care." See also the cases of L. & N. R. R. Co. v. Staten's Admr., 163 Ky. 760, and Lile v. Louisville Ry. Co., 161 Ky. 347, and cases therein referred to.

Neither is there room for the application of the doctrine of *res ipsa loquitur* to the facts of this case, since in order to apply it as between master and servant there must be other evidence, although slight, showing the negligence of the master other than the mere happening of the accident. L. & N. R. R. Co. v. Allen's Admr., 174 Ky. 736. That doctrine, however, is but evidentiary, it furnishing only a presumption, and is defined to be but "a general way of saying that the circumstances at-

tendant upon an accident are of themselves of such a character as to justify a jury in inferring negligence as the cause of that accident.'' 34 Cyc. 1665. In this case, even if the doctrine were applicable, the jury from the evidence and under appropriate instructions found that there was no negligence in any of the matters complained of.

It is shown that it is possible for a rope like the one involved to become crystallized so as to make it brittle and more easily broken, yet furnishing no external indications of its infirmities. This crystallization may be brought about in many ways, some of which might be produced by the manner in which the rope was used, and others by improper chemical influence or changes in temperature during the process of manufacture. However, in this instance it is shown to have been impossible for defendants, by any acts of omission or commission, to cause crystallization at the point where the rope broke.

Lastly, it is complained that the court erred in excluding the testimony of a witness as to the appearance of a piece of rope examined by him some time after the accident, and which it is claimed was the short end of the rope that broke but was lost and not produced at the trial. In the first place it was not by any means made clear by the evidence that the rope about which the witness testified was a part of the broken rope complained of, but if the identity was sufficiently substantiated, another witness testified to practically the same facts, and the excluded testimony of which complaint was made was but cumulative and was not offered in chief, but in rebuttal. In the light of all of these facts, and considering that the court is vested with a reasonable discretion as to the order of the introduction of testimony, and keeping in mind the great preponderance of the testimony as to the condition of the break as shown by the exhibited long end of the rope, we do not see wherein the court erred in the matter complained of.

Before closing this opinion, we wish to call the attention of counsel to Rule XXII, adopted by this court, requiring maps, diagrams and other illustrative exhibits used on the trial to be made a part of the record and brought to this court with it. In this case there were used at the trial maps, photographs, models and one end of the broken rope, all of which were made a part of the record, and which no doubt would have greatly assisted

us in understanding the case, but none of them was brought to this court. Since the rule is of recent adoption, and perhaps became enforceable after the taking of this appeal, we will content ourselves by only calling attention of counsel thereto, but we wish to insist that attorneys generally see that the rule is complied with by having the various clerks of the courts to forward with the record all such exhibits.

However much we might deplore the result of this accident, or however deeply we might sympathize with the deceased, who is shown to have been without fault, we are not thereby authorized to reverse the judgment based on the verdict of a jury returned under instructions which we regard as faultless, and upon evidence abundantly sustaining it.

Wherefore, the judgment is affirmed.